Argued October 4; reversed October 17, 1933

# ANDERSON *v.* THOMAS

(26 P. (2d) 60)

*J. M. Devers* and *Willis S. Moore,* Assistant Attorneys General (I. H. Van Winkle, Attorney General, on the brief), for appellant.

*Percy A. Cupper,* of Salem (Millen F. Kneeland, of Portland, on the brief), for respondent.

*Ralph A. Coan, Alfred A. Hampson, Charles A. Hart, Frederick J. Betz,* and *Arthur C. Spencer,* all of Portland, amici curiae.

BAILEY, J. This suit was brought by the plaintiff in the circuit court for Marion county against the commissioner of public utilities of this state to enjoin the enforcement of chapter 429, Oregon Laws 1933, known as the "Motor Transportation Act". The demurrer to the second amended complaint was overruled and a decree was entered by the circuit court declaring certain sections of the act unconstitutional and upholding the remaining provisions of the statute. From this decree both parties appealed.

Plaintiff, according to the allegations of his second amended complaint, was at the time of the institution of this suit, and for a long period prior thereto, "engaged in the transportation of property for hire by motor vehicles, owned and operated by him, upon the public highways of the state of Oregon, not exclusively in the incorporated limits of any city or town or within three road-miles thereof, under special and individual agreements, with persons of his own selection with whom he desires to contract", but not holding himself out as being willing to serve the public generally. In

the regular course of his business plaintiff is engaged in transporting sugar, automobile supplies and canned goods from the city of Portland, Oregon, to Salem, over the public highways, in motor vehicles, under special and individual contracts for such services. As a part of his regular business the plaintiff also engages in seasonable transportation of fruits, nuts, vegetables and farm products from orchards and farms to market, and at infrequent intervals in the transportation of logs, poles and rough timber from the places at which they are cut to places where manufactured or used. He also uses the highways for the transportation of wood which he purchases from the producer and re-sells to the consumer.

With a claim that the motor transportation act is violative of the constitutions of the United States and of the state of Oregon, plaintiff alleges that said act in effect compels him as a private carrier and as a contract carrier engaged in private business to assume against his will the duties and burdens of a common carrier, and subjects him to unlawful and unreasonable regulations in that the commissioner of public utilities is authorized, and it is made his duty, (1) to supervise and regulate all contract carriers; (2) to fix, alter, regulate, determine, declare and prescribe rates, fares, charges, classifications and practices of contract carriers; (3) to prescribe the kind and form of accounts, manifests, receipts and records to be used and kept pertaining to the operations of contract carriers, and the method and manner of keeping the same, and the preservation thereof for such time as the commissioner may determine proper, with access thereto and with right of audit and inspection thereof at all reasonable times; (4) to require the filing of such periodical

reports or other data of such contract carriers as he may deem necessary; (5) to require the filing with such commissioner of the schedule of all rates, fares and charges made, and all rules, regulations and practices adopted by each contract carrier before the same become effective; and to require that said rates, fares, rules, regulations and practices shall be reasonable and fair, and shall not be unduly discriminatory, prejudicial or preferential, and that no contract carrier shall charge, demand, collect or receive a greater, less or different remuneration for the transportation of property or any service in connection therewith, from the rates, fares and charges which shall have been regularly established and filed with the commissioner; (6) to supervise and regulate all contract carriers, who are forbidden to give or cause any unreasonable or undue advantage or preference to those whom they serve as compared with patrons of any common carrier, or to subject the patrons of any common carrier to any undue or unreasonable discrimination or disadvantage or by any unlawful competition to destroy or impair the service or business of any common carrier or the integrity of the state's regulation of any such service or business; (7) to classify and re-classify contract carriers and private carriers; (8) to cancel the permit of any contract carrier when the continued operation of the motor vehicle covered by his permit is contrary to public interest; and (9) to issue a permit to a contract carrier only upon the condition that the commissioner finds that (a) the equipment listed is safe for operation; (b) the operation proposed is not contrary to the public interest; (c) the rates, schedules and/or contracts proposed by the applicant are approved by the commissioner; and (d) the applicant

has agreed to pay the taxes required and to comply with the provisions of said act and obey all rules and regulations of the commissioner.

It is further averred that the motor transportation act is unfair, unjust and discriminatory against the plaintiff and in favor of (1) vehicles owned by creamery companies operated in picking up and transporting dairy products from farms and dairy ranches to the creamery; (2) vehicles used in hauling logs, poles and rough timber, which are placed in a special class and exempted from the payment of fees, charges, deposits and insurance exacted of contract carriers and are not required to pay the higher rates and meet other obligations and restrictions imposed on contract carriers, even when transporting other similar products such as wood, shingles, shakes, posts, etc.; (3) vehicles defined as private carriers which are required to pay only three-fourths mill per ton-mile tax; and (4) vehicles in the exempted class which are relieved from filing liability and property damage insurance policies for the protection of the public.

Plaintiff further declares that the provisions of the act are so exacting and onerous as to prevent a large number of contract carriers and private carriers from complying with its requirements, thereby tending to create a monopoly, in violation of section 20 of article I, constitution of the state of Oregon.

■ "In ascertaining the judicial value of a statute in litigation in which it is involved, it is necessary to consider not what actually has been done under it but what it authorizes and permits to be done. Sterett & Oberle Packing Company v. Portland, 79 Or. 260 (154 P. 410), opinion by Mr. Justice Henry J. Bean. This doctrine was laid down by Mr. Justice Robert S. Bean in Hood River Lumbering Co. v. Wasco County, 35 Or. 498, 512 (57 P. 1017). See also Leffingwell v. Lane

County, 64 Or. 144 (129 P. 538) ''. Purple Truck Garage Co. v. Campbell, 119 Or. 484 (250 P. 213, 51 A. L. R. 816).

Before discussing the legal questions raised on this appeal it will therefore be helpful to refer to the salient features of the act here under consideration.

Section 2 defines various terms used in the act, among which are the following:

"(f) 'Common Carrier' means any person who transports for hire, or who holds himself out to the public as willing to transport for hire, compensation or consideration, by motor vehicle, from place to place, persons or property, or both, for those who may choose to employ him.

"(g) 'Contract Carrier' means any person engaged in transportation by motor vehicle of persons or of property, or of both, for hire, under special and individual agreements or leases, and not included in the term common carrier as hereinbefore defined.

"(h) 'Private Carrier' means any person engaged in the transportation by motor vehicle of property sold or to be sold by him in the furtherance of any private commercial enterprise, or property of which such person is the owner or lessee, when transported for the purpose of lease or rent.

"(i) 'Special Carrier' means any person engaged in the transportation of logs, piling, poles or rough timber by motor vehicle over the public highways, commonly known as log haulers, from point of origin to mill, retail yard, point of consumption or railway shipping point."

In this section the term "Motor Carrier" is defined as including "common carrier", "contract carrier", "private carrier" and "special carrier".

Section 3 provides that no part of the act, except that section and section 32, shall apply to persons operating motor vehicles: (a) when operated wholly

within the limits of a city or town and for a distance not exceeding three road-miles beyond such corporate limits; (b) when engaged exclusively in transporting students or their instructors to or from school; (c) when regularly operating over a rural mail route; (d) "when used exclusively by the owner thereof in transporting from point of original production on farm or orchard of such owner in this state the products of said farms or orchards to creameries or to plants devoted to conditioning and packing the products for shipping, or when used exclusively by the owner thereof in the transporting of said products from said point of origin to market; or the infrequent transportation on trucks having a capacity of not to exceed one and one-half tons and for nominal consideration by one farmer or orchardist for another farmer or orchardist in his immediate neighborhood of products of the farm, orchard or dairy to market, and the infrequent transportation on such trucks for nominal consideration from market to farm or orchard of foodstuffs or other commodities consumed on said farm or orchard"; (e) when owned and operated by the United States, the state of Oregon, or any county, city, town or municipality in this state; (f) when "owned by creamery companies and operated exclusively in picking up and transporting dairy products from farms or dairy ranches to the creameries of the respective owners of such vehicles and not operated for hire or consideration directly or indirectly; this exemption shall not extend to or protect any scheme, practice or device whereby the creamery or carrier for a differential in price paid or agreed to be paid to the farmer or dairyman or other producer is intended to or does in fact cover or absorb a transportation charge"; and (g)

vehicles especially constructed for towing and wrecking and not otherwise used in the transportation of goods and merchandise for compensation.

These motor vehicles are, however, by section 3 made subject to the following requirements: persons operating in the exempted class (a) are subject to the regulations of the cities and towns in which they operate; persons included in all the remaining exempted classes are required to register their vehicles with the commissioner before using the same and to maintain thereon a distinctive marker indicating that the vehicles are operated exclusively in the exempted classes. No vehicles in any of the exempted classes except classes (a), (c), (d) and (e) can be operated without having first been approved by the commissioner as being safe for operation on the public highways. Vehicles in the exempted classes can not be operated for any purpose not falling within said exempted classes.

The policy of the state relative to the use of its highways is declared in section 4, as follows:

"The business of operating as a motor carrier of persons or property for hire upon the highways of this state is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic, and the fact that under existing law many motor trucks, trailers and busses are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulations should be employed, to the end that the highways may be rendered safer for the use of the general public; that the wear of such highways may be reduced; that minimum of inconvenience to other users of the highways may be effected; that minimum hindrance and stoppage to other users of the highways compatible with the needs of the public for adequate transportation service, may be

effected; that the highways may be safeguarded from improper or unnecessary usage; that operation by irresponsible persons or any other operation threatening the safety of the public or detrimental to the general welfare be prevented; that discrimination in rates charged may be eliminated; that congestion of traffic on the highways may be minimized; that the various transportation agencies of the state may be adjusted and correlated so that public highways may serve the best interest of the general public; that it is necessary that statutes be passed to provide a method of assessing privilege taxes to enable the further construction of highways and to provide for the operation, preservation and maintenance of highways already built, and the legislature hereby declares that to effect the foregoing ends and purposes this statute is adopted; provided, however, that nothing in this act shall be construed as requiring or authorizing a compliance with, or an application of, any law or rule with respect to a certificate of public convenience and necessity as a condition to the granting of any permit authorized by this act.''

Section 5 prohibits motor carriers as therein defined from operating any motor vehicle for the transportation of either persons or property, or both, on public highways except in accordance with the provisions of the act.

Section 6, subdivision 1, is, with the exception of subparagraphs (d) and (e), by section 7 made applicable to contract carriers, and said section 7 was, by the circuit court, held unconstitutional. Said subdivision 1 vests in the commissioner of public utilities power and authority, and makes it his duty, to regulate all common carriers of persons or property, or both, and, with respect thereto:

''(a) After hearing, to fix, alter, regulate, determine, declare and prescribe just, fair and reasonable

rates, fares and charges and just, fair and reasonable classifications and practices;

"(b). To prescribe the kind and form of accounts, manifests, receipts and records to be used and kept pertaining to operation, and the method and manner of keeping same, and to require the preservation of same for such time as the commissioner may determine proper, and to have access thereto with right of audit and inspection thereof at all reasonable times;

"(c) To require the filing of such periodical or other reports or other data of such carriers as the commissioner may deem necessary;

"(d) To require reasonably adequate service and facilities;

"(e) To regulate operating and time schedules so as to meet the needs of any community served and so as to prevent unnecessary duplication by common carriers of the transportation services afforded by other common carriers, or by contract carriers;

"(f) To prescribe and require reasonable precautions for safety of operation of motor vehicles;

"(g) To relieve the highways of all undue burdens and to safeguard traffic thereon by promulgating and enforcing reasonable rules, regulations and orders designed and calculated to prevent serious highway congestion, and to minimize the dangers attending transportation on the public highways of all commodities including explosives or highly inflammable or combustible liquids, fluids, substances or gases."

Under section 6, subdivision 2, common carriers are required to file schedules of all rates, fares and charges made by them and all rules, regulations and practices adopted by them, with the commissioner, before the same become effective; and no common carrier is permitted to charge, demand, collect or receive a greater, less or different remuneration from the rates, fares and charges shown on the schedules filed by it, nor permitted to refund or remit any of the fares or charges required to be collected by it in its tariffs.

The commissioner is given power, on his own motion or on complaint, to investigate rates, fares, charges, rules, regulations and practices and correct the same. It is further provided that the commissioner may refuse to accept a time schedule or tariff that will in his opinion impair the ability of carriers to serve the public. "No common carrier will be permitted to restrict its service to paying schedules or high class commodities with a low rate in competition with a common carrier giving complete service; provided, however, that this provision shall not apply to the transportation of commodities requiring special equipment or to the transportation of express or any special or particular commodity which because of its character or use requires rapid transit."

Section 7 vests the commissioner with power and authority, and makes it his duty, to supervise and regulate all contract carriers of persons and property and with respect thereto exercise and perform all and singular the powers and duties stated in subparagraphs (a), (b), (c), (f) and (g) of subdivision 1 of section 6 of the act, "except that he shall not require contract carriers to be or become common carriers. Every contract carrier is hereby forbidden to give or cause any undue or unreasonable advantage or preference to those whom he serves as compared with patrons of any common carrier or to subject the patrons of any common carrier to any undue or unreasonable discrimination or disadvantage or by unfair competition to destroy or impair the service or business of any common carrier or the integrity of the state's regulation of any such service or business; and, to the end that the commissioner may enforce these provisions, each such contract carrier shall file with the commis-

sioner copies of his contract, showing rates, fares, charges and practices, for approval of the commissioner before the same become effective, and the commissioner shall have jurisdiction over rates, charges and practices to the same extent as is required by subdivision 2 of section 6 hereof in the case of common carriers, and the provisions of said subdivision 2 of section 6 of this act are by this reference made applicable to contract carriers and the commissioner shall apply and enforce the same accordingly''.

This entire section was by the circuit court declared unconstitutional.

Section 8 grants to the commissioner power, general or otherwise, to prescribe rules and regulations in conformity with the act, better to accomplish the enforcement of its provisions, and said rules are to cover all four classes of motor carriers. The commissioner is further given power to make such subdivision of classes as may work to the effective administration of the act. He is also granted authority, by subdivision 1 of section 8, to require the weighing of the motor vehicle when empty and when loaded, at reasonable intervals, inspect and require proper equipment and insure the making of necessary repairs to promote the efficient, safe operation of the vehicle. Subdivision 2 of this section empowers the commissioner to prescribe the limit of hours that drivers or operators may remain on duty. Subdivision 3 authorizes him to require every person operating as a common carrier or contract carrier of property, except contract carriers transporting dairy products from farm to factory, to issue receipts in triplicate for freight received for shipment, which receipts shall contain the name of the truck operator, date and place

received, name of consignor, name of consignee, description of shipment, weight, rate and charges, and the signature of the carrier or his agent; one of said receipts to be delivered to the consignor, one to the consignee and one to be retained by the carrier.

By subdivision 4 of section 8 the commissioner is authorized to "prescribe rules governing amendments of permits covering additions to and withdrawals of vehicles and the extension or contraction of routes, and the filing of applications therefor"; by subdivision 5, to classify and reclassify carriers in accordance with certain subparagraphs of the act; by subdivision 6, to "prescribe forms of accounts and records to be kept, reports to be made and blanks to be used by common and contract carriers in transportation operations and matters incidental thereto". The foregoing subdivisions 3, 4 and 6 of section 8 were by the circuit court declared unconstitutional in so far as they pertain to contract and private carriers.

Section 9, subdivision 1, prohibits any persons operating any motor vehicle on any highway in this state as a common carrier, contract carrier, private carrier or special carrier without first applying for and obtaining in addition to the license required by law a permit from the commissioner covering the proposed operation. In the case of all carriers except private carriers the application for the permit must state the ownership, financial condition, equipment to be used, weights, physical property of the applicant, character of the service, the district or territory in which operations are to be conducted, and such other information as may be required. Said subdivision also provides that no vehicle shall be operated in more than one of the four classes covered by the act, except that

contract carriers may haul or transport logs, piling and poles, and that in the discretion of the commissioner a vehicle registered and licensed as a special carrier or private carrier may be operated temporarily as a contract carrier or common carrier.

Section 10 provides for the fees which shall be paid by all motor carriers and also requires that all motor carriers except private carriers shall annually file with the commissioner a report showing in detail certain designated information and such other matters pertaining to the operation of the carriers as the commissioner may require.

Section 11, subdivision 2, refers to common carriers but is by reference in section 12 made applicable to contract carriers and in so far as it refers to contract carriers was, by the circuit court, declared unconstitutional. Under subdivision 2 no person who was not engaged as a common carrier at the time of the passage of this act, except an applicant who is a contract carrier and was operating as such in 1932, can procure a permit as a common carrier until after hearing on his application. Section 11 of the act further provides:

"If the commissioner finds from the record and the evidence that:

"(a) The applicant, if an intrastate operator, is financially responsible and adequately equipped to perform the service proposed;

"(b) That the equipment listed is safe for operation;

"(c) That the operation proposed is not contrary to the public interest;

"(d) That the service proposed will not be attended with substantial damage to the highways or danger to other users thereof or to the public;

"(e) That the granting of a permit will not result in the impairment of the ability of existing operators to adequately serve the public;

"(f) That the applicant, if an intrastate operator can and will file cargo and/or passenger insurance as provided in this act;

"(g) That the rates, schedules, and/or contracts proposed by the applicant, if an intrastate operator, are approved by the commissioner;

"(h) That the applicant can and will file liability and property damage bond or suitable insurance policy as provided in this act; then the commissioner, upon compliance by the applicant with the law and the rules and regulations of the commissioner, shall issue a permit, but unless said findings are so made by the commissioner the application shall be denied or the permit issued with such conditions imposed by the commissioner as will when complied with meet the· requirements of this act;

"(i) That applicant has agreed to pay the privilege taxes provided for herein, comply with the provisions of this act and obey all of the rules and regulations of the commissioner;

"(j) Whenever any contract hauler, as said term is defined by existing law, who was operating upon the highways of this state during the year 1932, elects to become a common carrier under the provisions of this act, then and thereupon the commissioner, upon application of such contract hauler, shall classify his status as a common carrier under the provisions of this act, and a permit as common carrier shall be issued to him by the commissioner, upon his compliance with the provisions of this act."

Section 12 provides that permits shall be issued to contract carriers only after hearing conducted and had by the commissioner in conformity with the require- ments of subdivision 2 of section 11 of this act, except in cases in which the applicant is a contract carrier and operated as such in 1932. In either event, permits shall issue "only upon a showing by said contract carrier before said commissioner justifying the issu- ance of the permit under the provisions of said sub-

division 2 of section 11, except that such applicant shall not be required to serve as a common carrier''; provided, that if in the opinion of the commissioner the operation proposed by any applicant for a permit to operate as a contract carrier is not contrary to public interest and will not be attended with substantial damage to the highways or danger to other users thereof or to the public, the commissioner may dispense with a public hearing. Before any permit is issued, however, the applicant must show that he is financially responsible and adequately equipped and is capable of furnishing the service proposed, and that he will comply with all provisions of the act and furnish the bond and insurance required.

Section 13 applies to permits to special carriers, which may be issued by the commissioner, but only upon a showing justifying the issuance thereof. Before a permit is issued, however, the commissioner is required to call upon the state highway commission or upon the county commissioners, depending upon where the operations are to be conducted, over state highways or county highways, for such recommendations or suggestions as to conditions which shall be imposed for the protection of the highways ''as will be for the best interests of the general public''. All such permits shall be temporary and shall be revoked upon recommendation of the state highway commission in respect to state highways, and by the county commissioners in respect to county highways, when such revocation is, in the judgment of such officials, necessary for the preservation of the highways.

Section 14 provides that permits to private carriers shall be issued by the commissioner, conditioned that the proposed operations will not· be contrary to the public interest.

Section 15 provides for term and cancelation of permits, and section 16 limits the right to assign or transfer permits.

Section 17 provides that in addition to the license fees or taxes otherwise imposed by law upon common carriers and· contract carriers there shall be assessed against and collected from every such carrier a tax of one mill on combined weight-ton-mile on the public highways; and upon private carriers a tax of three-fourths mill computed on the basis of combined weight of each motor vehicle involved, "to apply to the cost of the administration of this act and for the maintenance, repair and reconstruction of public highways".

Section 18 relates to the keeping of daily records by all motor carriers except special carriers, and the filing of the same with the commissioner. Section 19 provides for the monthly payment of fees due from carriers to the state. Section 20 refers to special carriers.

Section 22, subdivision 1, provides that no permit shall be issued to a motor carrier (which includes all four classes) until the operator thereof has filed with the commissioner a policy of public liability and property damage issued by an insurance company, for the reasonable indemnification of patrons of the applicant and of the public against damage or injury for which the applicant may be liable.

Subdivision 2 of section 22 was held by the circuit court to be unconstitutional in so far as it pertains to contract carriers and private carriers. This subdivision provides that no permit shall be issued to operate as any class of motor. carrier except special carrier until the applicant shall have filed with the commis-. sioner a bond satisfactory to him in the penal sum of

$1,000, said bond to be conditioned that the applicant shall pay any and all fees, taxes and penalties which may be or become due under the requirements of the act and shall comply with all orders, rules and regulations of the commissioner made pursuant to the act.

Section 23, in so far as it pertains to contract carriers, was declared unconstitutional by the circuit court. This section requires every common carrier and contract carrier, whenever directed by the commissioner, to file with him copies of all contracts which "relate to the transportation of persons and/or property or any service in connection therewith, made or entered into by him with any other common carrier or contract carrier or with any other transportation company or carrier, or any shipper or shippers, consignee or consignees, or other person or persons, doing business with such common carrier or contract carrier, as the case may be".

We will not, at this time, refer to any of the other sections of the act. It may, however, be necessary, in discussion of the questions raised, to refer to other sections, or in further detail to sections already mentioned.

The plaintiff assails the constitutionality of the motor transportation act on numerous grounds. For that reason it has been deemed advisable to review at considerable length the various provisions of the act as the same apply to the four classes of motor carriers enumerated in and covered by the enactment, i. e., common carriers, contract carriers, special carriers and private carriers. Many of the regulations are first applied to common carriers, and by reference made applicable to the other three classes, especially to contract carriers.

■ The only limit to a state's power to regulate agencies of transportation is such restriction as is fixed by the state and federal constitutions. Where state enactments affecting regulation have been attacked, the ground usually assigned has been the alleged conflict with the federal constitution, notably its due process, equal protection and commerce clauses. In this case the validity of the act under consideration is attacked principally on the ground that it conflicts with certain provisions of the federal constitution, and the state constitution is referred to only casually.

■ In recent years, with the advent of motor vehicles and the improvement of highways, there has arrived a new and rapidly growing form of commercial transportation — busses for passengers and trucks for freight. Oregon, one of the first states to appreciate the necessity of hard-surfaced highways, has spent many millions of dollars, raised by bond issues, license fees and gasoline tax, in the construction and maintenance of highways and bridges. With the increase of traffic it has been necessary to widen and straighten the roadways, and in many instances to rebuild them entirely, in order to care for present and future needs. Either alone or in cooperation with the state, the cities and counties have contributed many more millions of dollars in establishing rights of way and in the construction and maintenance of highways.

''The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual, and extraordinary. As to the former, the

extent of legislative power is that of regulation; but, as to the latter, its power is broader. The right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all the authorities:

" 'A distinction must be made between the general use, which all of the public are permitted to make of the street for ordinary purposes, and the special and peculiar use, which is made by classes of persons in the pursuit of their occupation or business, such as hackmen, drivers of express wagons, omnibuses, etc. Tiedeman on Municipal Corporations, § 299.

" 'The rule must be considered settled that no person can acquire the right to make a special or exceptional use of a public highway, not common to all citizens of the state, except by grant from the sovereign power'. Jersey City Gas Co. v. Dwight, 29 N. J. Eq. 242; McQuillen, Municipal Corporations, 1620''. Ex parte Dickey, 76 W. Va. 576 (85 S. E. 781, L. R. A. 1915F, 840).

The same principle is thus stated in *Stephenson v. Binford*, 287 U. S. 251 (77 L. Ed. 203, 53 S. Ct. 181):

"It is well established law that the highways of the state are public property; that their primary and preferred use is for private purposes; and that their use for purposes of gain is special and extraordinary, which, generally at least, the legislature may prohibit or condition as it sees fit. Packard v. Banton, 264 U. S. 140, 144, 68 L. Ed. 596, 607, 44 S. Ct. 257, and cases cited; Frost & F. Trucking Co. v. Railroad Commission, 271 U. S. 583, 592, 593, 70 L. Ed. 1101, 1104, 1105, 47 A. L. R. 457, 46 S. Ct. 605; Hodge Drive-It-Yourself Co. v. Cincinnati, 284 U. S. 335, 337, 76 L. Ed. 323, 326, 52 S. Ct. 144; Johnson Transfer & Freight Lines v. Perry (D. C.), 47 F. (2d) 900, 902; Southern Motorways v. Perry (D. C.), 39 F. (2d) 145, 147; People's Transit Co. v. Henshaw (C. C. A. 8th), 20 F. (2d) 87, 89; Weksler v. Collins, 317 Ill. 132, 138, 139, 147 N. E. 797; Maine Motor Coaches v. Public Utilities Commission, 125 Me. 63, 65, 130 A. 866.''

In about the year 1930 the Interstate Commerce Commission undertook an investigation for the purpose of securing needed information in regard to transportation by motor vehicles. In 1932 it submitted an exhaustive report (Coordination of Motor Transportation, 182 I. C. C. 263), wherein it is said, among other things, that:

"Since data necessary for full correction are not available, it will be conservatively estimated that nearly 20 per cent of the truck traffic, in terms of ton-miles, is handled by common-carrier operators, 30 per cent by *bona fide* contract operators, and 50 per cent by privately operated trucks. This conclusion probably overstates the proportion of private trucking and understates the proportion of contract trucking". Page 407.

"The growing use of trucks necessitates extensive financing of highway construction and maintenance; their operation is attended by danger to persons and property on or in the vicinity of the highways and is hazardous to the public". Page 375.

And at page 280 the report states:

"There is a considerable degree of financial irresponsibility present in the highway trucking industry owing to the small scale of most motor-truck operations, the ease of entering the industry, including the purchase of new or second-hand equipment with small down payments, the frequent lack of experience and knowledge of costs, and the presence of operators of the so-called wildcat or fly-by-night type. This is particularly true in the case of interstate and contract operators."

With these pronouncements in mind, we will proceed to a consideration of the questions raised on this appeal.

The first point discussed by the plaintiff stresses the fact that the act imposes upon contract car-

riers the duties, obligations and burdens generally imposed upon common carriers, and that since contract carriers cannot be required to assume such burdens and obligations without their consent, the act, in that respect, violates the federal constitution. In support of this contention that such duties and obligations are imposed on contract carriers, plaintiff directs our attention to section 7 of the act, which makes applicable to contract carriers subparagraphs a, b, c, f and g of subdivision 1 of section 6, also applying to common carriers. Subparagraphs d and e of the same subdivision are not, however, made applicable to contract carriers. Subparagraph d grants to the commissioner power to require common carriers to furnish reasonably adequate service, and subparagraph e grants to the commissioner power to regulate common carriers as to time schedules.

A contract carrier is defined to be any person engaged in transportation for hire "and not included in the term common carrier as hereinbefore defined", and sections 7 and 12 contain prohibitions against the commissioner's requiring contract carriers to become common carriers.

In passing upon a similar contention, the supreme court of the United States in *Stephenson v. Binford,* supra, observed:

"We are of opinion that neither by specific provision or provisions, nor by the statute considered as a whole, is there an attempt to convert private contract carriers by motor into common carriers. Certainly, the statute does not say so. Common carriers by motor and private contract carriers are classified separately and subjected to distinctly separate provisions. By § 1 (h), the contract carrier is defined as 'any motor carrier * * * transporting property for compensation or hire over any highway in this state *other than*

*as a common carrier'.* It is difficult to see how the legislature could more clearly have evinced an intention to avoid an attempt to convert the contract carrier into a common carrier. It is true that the regulations imposed upon the two classes are in some instances similar if not identical; but they are imposed upon each class considered by itself, and it does not follow that regulations appropriately imposed upon the business of a common carrier, may not also be appropriate to the business of a contract carrier.''

Subsection 5 of section 8 authorizes the commissioner to ''classify and reclassify carriers in accordance with subparagraphs (f), (g), (h) and (i) of section 2 of this act''. This authority conferred upon the commissioner does not, however, authorize him to classify a contract carrier as a common carrier, or *vice versa.* It is conceivable that the applicant might designate himself as a private carrier or as a special carrier, and the commissioner in such instance would have authority to classify him according to the facts in the case. On the other hand, an operator who had been engaged as a special carrier might put himself outside that classification and into some other class. The only authority which the commissioner has under the subdivision above quoted is to classify or reclassify a carrier in accordance with the specifications set out in the act.

The supreme court of the United States in *Stephenson v. Binford,* supra, called attention to the findings of the court below to the effect that the inevitable result of the continuance of the enormous increase of private carriers for hire and the continuous decrease in the number of common carriers would be ''the practical disappearance altogether of common carriers from the roads'', and that the legislature had declared

that all the available carrier service, including common carriers by rail and road and contract carriers by road, was so interdependent that the public could not continue to have a safe and dependable transportation system unless private carriers operating on the same roads with common carriers were brought under just and reasonable regulations putting their service into relation with common carriers. The opinion then continues:

"These and other findings and the evidence contained in the record show conclusively that during recent years the unregulated use of the highways of the state by a vast and constantly growing number of private contract carriers has had the effect of greatly decreasing the freight which would be carried by railroads within the state, and, in consequence, adding to the burdens upon the highways. Certainly, the removal or amelioration of that burden, with its resulting injury to the highways, interference with their primary use, danger and inconvenience, is a legitimate subject for the exercise of the state legislative power. And that this was one of the chief ends sought to be accomplished by the provisions in question, the record amply establishes.

"The assailed provisions, in this view, are not ends in and of themselves, but means to the legitimate end of conserving the highways. The extent to which, as means, they conduce to that end, the degree of their efficiency, the closeness of their relation to the end sought to be attained, are matters addressed to the judgment of the legislature, and not to that of the courts. It is enough if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end. Compare M'Culloch v. Maryland, 4 Wheat. 316, 409, 410, 419, 421, 423, 4 L. Ed. 579, 602, 604, 605; Veazie Bank v. Fenno, 8 Wall. 533, 549, 19 L. Ed. 482, 488; Legal Tender Cases, 12 Wall. 457, 539-543, 20 L. Ed. 287, 308-310; Pom. Const. Law, 9th Ed., § 268a."

By the provisions of section 7 every contract carrier is prohibited from giving or causing any undue or unreasonable advantage or preference to those whom he serves as compared with patrons of any common carrier. In the last paragraph of section 6, made applicable to contract carriers, no contract carrier "will be permitted to restrict its service to paying schedules or high class commodities with a low rate in competition with a common carrier giving complete service", except in certain designated instances.

A contract carrier by giving any undue or unreasonable advantage or preference to his patrons as compared with patrons of any common carrier has the tendency to cripple the effectiveness of common carriers who must serve all the public on the same terms and conditions.

In referring to provisions similar to those of our statute above mentioned, the court in *Stephenson v. Binford,* supra, observed:

"Turning our attention then to the provision for permits, it is to be observed that the requirement is not that the private contract carrier shall obtain a certificate of public convenience and necessity, but that he shall obtain a permit, the issue of which is made dependent upon the condition that the efficiency of common carrier service then adequately serving the same territory shall not be impaired. Does the required relation here exist between the condition imposed and the end sought? We think it does. But in any event, if the legislature so concluded, as it evidently did, that conclusion must stand, since we are not able to say that in reaching it that body was manifestly wrong [citing authorities]. Debatable questions of this character are not for the courts, but for the legislature, which is entitled to form its own judgment. Sproles v. Binford, 286 U. S. 374, 388, 389, 76 L. Ed. 1167, 1178, 1179, 52 S. Ct. 581. Leaving out of consideration com-

mon carriers by trucks, impairment of the railway freight service, in the very nature of things, must result, to some degree, in adding to the burden imposed upon the highways. Or stated conversely, any diversion of traffic from the highways to the railroads must correspondingly relieve the former, and, therefore, contribute directly to their conservation. There is thus a substantial relation between the means here adopted and the end sought. This is made plain by the Sproles case, supra (p. 394):

" 'The state has a vital interest in the appropriate utilization of the railroads which serve its people, as well as in the proper maintenance of its highways as safe and convenient facilities. The state provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It can not be said that the state is powerless to protect its highways from being subjected to excessive burdens when other means of transportation are available. The use of highways for truck transportation has its manifest convenience, but we perceive no constitutional ground for denying to the state the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is not a case of denial of the use of the highways to one class of citizens as opposed to another, or of limitations having no appropriate relation to highway protection.''

In analyzing the provisions of the Texas statute, the statement of the court in *Stephenson v. Binford,* supra, points out that the act vests the railroad commission with authority to supervise and regulate the transportation of property on the public highways by motor vehicle, for compensation or hire; to fix maximum or minimum or maximum and minimum rates, fares and charges; to prescribe rules and regulations

for government of motor carriers and for the safety of their operations; to supervise and regulate in respect to matters affecting the relationship of the motor carriers and the shipping public, as may be necessary in the interest of the public; to prescribe rules and regulations governing the operation of contract carriers in competition with common carriers over the highways; and to prescribe minimum rates to be collected by such contract carriers, "which shall not be less than the rates prescribed for common carriers for substantially the same service". In its opinion construing the Texas statute the court apparently does not refer to the provision vesting the railroad commission with power to fix maximum rates, but does discuss that section of the act which provides that the rates prescribed for contract carriers in competition with common carriers "shall not be less than the rates prescribed for common carriers for substantially the same service". Therefore, in stating that the contract carrier is permitted to charge as much more than the common carrier "as he sees fit and can obtain", the court must have had reference to the restriction placed upon the railroad commission as to prescribing minimum rates for contract carriers in direct competition with common carriers, and not to the duty of the commission to fix maximum or minimum or maximum and minimum rates in other cases. In other words, the commission is allowed an exercise of discretion in fixing maximum rates charged by the contract carrier, but as to minimum rates can not prescribe or permit lower rates than those prescribed for common carriers for substantially the same service. Apparently there was no attempt on the part of the court to hold invalid the provision as to fixing maxi-

mum or minimum or maximum and minimum rates. In passing upon the authority of the commission to fix minimum rates, the court said:

"What has just been said applies in the main to the other challenged provision authorizing the commission to prescribe minimum rates not less than those prescribed for common carriers for substantially the same service. This provision, by precluding the contract carriers from rendering service at rates under those charged by the railroad carriers, has a definite tendency to relieve the highways by diverting traffic from them to the railroads. The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly, this interferes with the freedom of the parties to contract, but it is not such an interference as the Fourteenth Amendment forbids. While freedom of contract is the general rule, it is nevertheless not absolute but subject to a great variety of legitimate restraints, among which are such as are required for the safety and welfare of the state and its inhabitants. [Numerous authorities cited.] When the exercise of that freedom conflicts with the power and duty of the state to safeguard its property from injury and preserve it for those uses for which it was primarily designed, such freedom may be regulated and limited to the extent which reasonably may be necessary to carry the power and duty into effect. [Citing many precedents.]

"Here the circumstance which justifies what otherwise might be an unconstitutional interference with the freedom of private contract is that the contract calls for a service, the performance of which contemplates the use of facilities belonging to the state; and it would be strange doctrine which, while recognizing the power of the state to regulate the use itself, would deny its power to regulate the contract so far as it contemplates the use. 'Contracts which relate to the use of the highways must be deemed to have been made

in contemplation of the regulatory authority of the state'. Sproles v. Binford, supra (286 U. S. at pp. 390, 391, 76 L. Ed. 1180, 1181, 52 S. Ct. 581), and authorities cited. The principle that Congress may regulate private contracts whenever reasonably necessary to effect any of the great purposes for which the national government was created, Highland v. Russell Car & Snow Plow Co., supra (279 U. S. at p. 261, 73 L. Ed. 691, 49 S. Ct. 314), applies to a state under like circumstances.''

The objects sought to be accomplished by the legislature in the enactment of the statute in question in the case at bar are, as contained in its declaration of policy, to conserve and maintain the highways, to render them safer for use by the public, to eliminate discrimination in rates, and to adjust and correlate the various transportation agencies of the state so that the interest of the public may best be served. Although the constitutionality of a statute cannot stand upon legislative declaration alone, against the challenge of its validity, nevertheless the legislative declaration of purpose and policy is entitled to gravest consideration, unless overthrown by facts of record: Stephenson v. Binford, 53 Fed. (2d) 509. Here there is no attempt by plaintiff in his pleadings to overcome the existing facts recited by the legislature as making necessary this enactment.

The supreme court of the United States in the case of Stephenson v. Binford, 287 U. S. 251, distinguishes the case of Frost Trucking Co. v. Railroad Commission, 271 U. S. 583, from the Stephenson-Binford case in that the supreme court of California had construed the statute in the Frost case as not in any real sense a regulation of the use of the public highways, but as serving to protect the business of those who were

common carriers by controlling, in effect, competition. The purpose there attempted to be accomplished, according to the court, was not the protection or conservation of, or in any way related to, the highways. After pointing out the grounds on which the Frost case was decided, the court proceeds to discuss the policy underlying the Texas statute, as follows:

"The Texas statute, on the contrary, rests definitely upon the policy of highway conservation, and the provision now under review is governed by the same principle as that which recognizes the authority of a state to prescribe the conditions upon which it will permit public work to be done on its behalf. Among such conditions it may prescribe that laborers employed by a contractor to do such work shall not be permitted to labor more than eight hours per day. Atkin v. Kansas, 191 U. S. 207. 'It can not be deemed a part of the liberty of any contractor', it is said at pp. 222, 223, 'that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern'. See also Ellis v. United States, 206 U. S. 246; Heim v. McCall, 239 U. S. 175. It may be said with like force that it belongs to the state, 'as master in its own house', to prescribe the terms upon which persons will be permitted to contract in respect of the use of the public highways for purposes of gain. See Hodge Drive-It-Yourself Co. v. Cincinnati, 284 U. S. 335.

"We need not consider whether the act in some other aspect would be good or bad. It is enough to support its validity that, plainly, one of its aims is to

conserve the highways. If the legislature had other or additional purposes, which, considered apart, it had no constitutional power to make effective, that would not have the result of making the act invalid. Ellis v. United States, supra. Nor does it matter that the legislation has the result of modifying or abrogating contracts already in effect. Such contracts are to be regarded as having been made subject to the future exercise of the constitutional power of the state. Louisville & N. R. Co. v. Mottley, 219 U. S. 467; Union Bridge Co. v. United States, 204 U. S. 364; Sproles v. Binford, supra.''

Many of the provisions relative to common carriers, in the act under consideration in the case at bar, are by reference made applicable to contract carriers. The statute, however, recognizes a distinction between the two classes and it is reasonable to assume that the commissioner will, when dealing with contract carriers, bear this distinction in mind. As was said by Mr. Chief Justice Hughes in *Continental Baking Co. v. Woodring*, 286 U. S. 352 (52 S. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402), in construing a Kansas statute:

''In the instant case, the statute itself clearly distinguishes in fundamental matters between the obligations of public and private carriers and places upon the latter certain requirements which the state had power to impose. Whatever uncertainty may exist with respect to possible regulations of the commission will be resolved as regulations are promulgated. If any of these transcend constitutional limits, appellants will have their appropriate remedy. The provision as to keeping records and furnishing reports and information and as to maintaining uniform methods of accounting, may in the case of private carriers of property be assumed, until the contrary appears, to have relation, as the state authorities assert, to the determination of the amount of the tax to which the

private carriers are properly liable. The general grant of authority to the public service commission over all the carriers described, including both public and private carriers, in all matters affecting their relationship with the traveling and shipping public, we think should be taken distributively in the light of the context and of the manifest distinctions in the relation of different sorts of carriers to the public. The distinction made by the statute between public and private carriers with respect to the obtaining of certificates of public convenience and necessity, and as to rates and charges, indicates the intention to keep separate the special responsibilities of public carriers from the more limited but still important duties which are owing as well by private carriers, in protecting the public highways from misuse and in insuring safe traffic conditions, and there is no reason to conclude that the authority given to the commission will not be viewed and exercised accordingly.''

In the Woodring case the plaintiffs were private carriers operating bakeries in Kansas and other states and making deliveries to their customers by their own trucks.

■ The provision of the Oregon motor transportation act relating to the authority of the commissioner to fix the rates of the contract carrier is pointed out by the plaintiff here as pertaining especially to common carriers and not to contract carriers. No particular complaint is made by the plaintiff that he has been or will be deprived of any property rights by the commissioner's fixing maximum rates which he may charge, and in fact no such complaint could be considered by us until such rates were established, or threatened; but the gist of his complaint is that he is deprived of his right to contract in competition with common carriers.

The Kentucky motor transportation act, the constitutionality of which was attacked by private contract carriers on numerous grounds in the case of *Baker v. Glenn,* 2 F. Sup. 880, prohibited contract carriers from giving or causing any undue or unreasonable advantage to their patrons, as compared with patrons of any common carrier, or from destroying or impairing by unfair competition the service of any common carrier or impairing the integrity of the state's regulation of any such service. The statute further required contract carriers to maintain on file with the commission statements of their charges and such other matters as the commission might direct. It also granted the commission authority, upon complaint filed with it or upon its own motion, to prescribe rates, fares, charges, maximum or minimum, or maximum and minimum, thereafter to be charged, and the practices thereafter to be observed by contract carriers. Authority was conferred upon the commission to issue from time to time, after hearing, such general and special orders regulating and controlling the business of contract carriers as might be deemed reasonably necessary to prevent violation of section 5 of article 3 of the act. The case of *Baker v. Glenn,* supra, was heard by a statutory court consisting of three judges, under section 266 of the Judicial Code, and the constitutionality of the act in question was upheld, on the authority of *Stephenson v. Binford,* supra, and *Sproles v. Binford,* 286 U. S. 374 (52 S. Ct. 581, 76 L. Ed. 1167).

The question in regard to the right of the state to fix reasonable rates as applied to contract carriers would seem to have been passed upon only inferentially by the courts, although several of the motor transportation acts which have been attacked on the ground

of unconstitutionality provide either for the fixing of maximum and minimum rates or reasonable rates. It has, however, been held that minimum rates may be prescribed and that contract carriers may be prohibited from giving unreasonable preferences to their patrons as compared with the patrons of common carriers: *Stephenson v. Binford,* supra. In the act in question in this case the legislature in its declaration of policy states that "the business of operating as a motor carrier of persons or property, for hire, upon the highways of this state, is declared to be a business affected with the public interest". In *Stephenson v. Binford,* supra, the supreme court of the United States, after referring to the contention of the state officials that contract carriers were engaged in a business "impressed with a public interest" and that reasonable regulation of their rates and practices was essential for the protection of the public, deemed it unnecessary in reaching its conclusion to consider whether or not the contract carriers' business was affected with the public interest and based its decision on the ground, that the state had a right to regulate the use of the state highways.

We have here, however, as above stated, a declaration by the legislature that the use of highways by motor carriers for hire is a business affected with the public interest. If this be true, the legislature undoubtedly has power to regulate the rates charged by contract carriers.

According to the findings of the Interstate Commerce Commission in its report above mentioned, the business of contract carriers exceeds that of common carriers by fifty per cent, measured in ton-miles. Their business necessarily affects the public because of its

volume, and to a marked degree. Because of the volume of such business the legislature had a right to infer that the operations of contract carriers did affect the public generally.

In the case of *Munn v. Illinois,* 94 U. S. 113 (24 L. Ed. 77), a question arose as to whether or not the general assembly of Illinois could, under the limitations imposed by the constitution of the United States, fix by law the maximum of charges for the storage of grain in warehouses in that state. After taking note of the police power of the state and of the extent of restrictions imposed by the federal constitution, the court remarked:

"This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only'. This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise *De Portibus Maris,* 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

See, also, *Budd v. New York,* 143 U. S. 517 (12 S. Ct. 468, 36 L. Ed. 247).

In *O'Gorman & Young v. Hartford Insurance Co.,*
282 U. S. 251 (51 S. Ct. 130, 75 L. Ed. 324), there was
involved the constitutionality of an act of the state of
New Jersey prohibiting any insurance company or in-
surer from allowing any commission in excess of a
reasonable amount to any person for acting as its agent.
In passing upon this question the court there stated:

"The business of insurance is so far affected with
a public interest that the state may regulate the rates,
German Alliance Insurance Co. v. Lewis, 233 U. S. 389;
and likewise the relations of those engaged in the
business, La Tourette v. McMaster, 248 U. S. 465;
Stipcich v. Metropolitan Life Insurance Co., 277 U. S.
311, 320. Compare McCarter v. Firemen's Insurance
Co., 74 N. J. Eq. 372, 382. * * *

"The statute here questioned deals with a subject
clearly within the scope of the police power. We are
asked to declare it void on the ground that the specific
method of regulation prescribed is unreasonable and
hence deprives the plaintiff of due process of law. As
underlying questions of fact may condition the con-
stitutionality of legislation of this character, the pre-
sumption of constitutionality must prevail in the ab-
sence of some factual foundation of record for over-
throwing the statute. It does not appear upon the
face of the statute, or from any facts of which the
court must take judicial notice, that in New Jersey
evils did not exist in the business of fire insurance for
which this statutory provision was an appropriate
remedy. The action of the legislature and of the high-
est court of the state indicates that such evils did exist.
The record is barren of any allegation of fact tending
to show unreasonableness."

If minimum rates of contract carriers can be fixed
in order to preserve the efficiency of common carriers;
if insurance rates and the amounts of commission paid
insurance agents can be regulated; and if many mat-
ters not necessary to be mentioned here can be super-

vised because they are affected with the public interest, there appears no valid reason why the rates of contract carriers, whose principal business is conducted on the public highways, can not likewise be supervised and regulated.

In order to enforce the requirements of the act it is undoubtedly necessary to vest the commissioner of public utilities with authority to grant and cancel permits, to require reports and other information from the motor carriers subject to his jurisdiction and to promulgate such rules in respect thereto as he may deem advisable. The functions performed by contract carriers are in many respects similar to those of common carriers by truck. It does not appear that the latter possess any special privileges or monopoly of business. Both are granted the use of the highways on certain conditions.

It is not shown by the pleadings that the commissioner has promulgated any rules or regulations as to contract carriers, or that he has any rules or regulations in mind, which will adversely affect the complainant and others similarly situated. Much of the business of the contract carriers is done under special contracts with their patrons, and it is not beyond the power of the legislature to provide that copies of such contracts or agreements be filed with the commissioner "before they become effective". This does not mean, however, that the contract carrier must, prior to actual performance of any work, file the individual contract therefor with the commissioner, as under section 23 of the act the commissioner is given authority to fix the time within which copies of these contracts are to be filed with him.

The plaintiff's argument that the act is unconstitutional is based largely on the decision of this court in

*Purple Truck Garage Co. v. Campbell;* supra, *Frost Trucking Co. v. Railroad Commission,* supra, and *Smith v. Cahoon,* 283 U. S. 553 (51 S. Ct. 582, 75 L. Ed. 1264). The decision in *Purple Truck Garage Co. v. Campbell* was predicated upon that in *Frost Trucking Company v. Railroad Commission.* The decision in the latter case held that under the California act there involved a contract carrier in order to do business must submit to the condition of becoming a common carrier and be regulated as such by the railroad commission. This case is discussed and explained in *Stephenson v. Binford,* supra, and, according to the construction there placed upon the decision in the Frost case, it has no bearing on the act now before us. The decision in *Purple Truck Garage Co. v. Campbell,* following that of the Frost case, held in effect that the act there under consideration compelled the plaintiffs to become common carriers or quit their business and seek other employment. It was also held in the last mentioned case that ''a single transaction of transporting for hire a sack of wheat, a bale of hops or a box of apples, without complying with all the detailed minutiae of the act, will invoke the penalties of the act''. This objectionable feature of the 1921 enactment there in review was eliminated by section 3 of the 1933 act.

The case of *Smith v. Cahoon,* supra, is also examined and explained in the opinion in *Stephenson v. Binford,* supra, wherein the court says:

''The vice of the statute [referring to the statute involved in the Smith-Cahoon case] was that all carriers for hire, whether public or private, were put upon the same footing by explicit provisions which could not be severed so as to afford one valid scheme for common carriers and another for private carriers, with the result that until the separability of these pro-

visions should be determined by competent authority, they were void for want of certainty. In the Texas statute no such uncertainty exists. The provisions intended to be applicable to contract carriers are distinctly set forth and separately stated, plainly leaving for determination only the question whether such provisions, or any of them, are invalid as so applied. Continental Baking Co. v. Woodring, 286 U. S. 352, 354.''

We conclude that the 1933 motor transportation act is not unconstitutional in the particulars indicated by plaintiff, unless it be on the alleged discriminatory features pointed out by him, and which we shall now proceed to examine.

■ It is stated by plaintiff that the 1933 motor transportation act is unjustly and unlawfully discriminatory in that it imposes certain duties and obligations upon him which are not exacted of other operators of motor vehicles. In this connection attention is directed to section 3, which exempts certain persons therein mentioned from most of the requirements of the act. In his reply brief plaintiff, however, makes the following statement:

''Considerable space has been devoted in the brief to the various exemptions under section 3 of the act, but only one of which, that in favor of creamery companies, has been questioned in this litigation. We have not questioned the exemption in favor of farmers hauling their own produce and occasionally hauling for their neighbors, nor the exemption in favor of school busses, federal or state vehicles, towing and wrecking cars, or cars operated exclusively within a city or within three miles thereof.''

Although the plaintiff now concedes that he does not question the exemption as to farmers, we interpose that there is ample authority supporting and justifying such exemption: *Continental Baking Co. v. Wood-*

*ring,* supra; *Schwartzman Service, Inc., v. Public Service Commissioners,* 60 Fed. (2d) 1034; *State v. Public Service Commission,* 207 Wis. 664 (242 N. W. 668) ; *State v. Hicklin,* 168 S. C. 440 (167 S. E. 674).

Under section 3, vehicles owned by creamery companies and operated exclusively in picking up and transporting dairy products from farms and dairy ranches to the creameries of the respective owners of such vehicles, and not operated for hire or consideration, directly or indirectly, are exempted from the main provisions of the act. It is, however, specified that "this exemption shall not extend to or protect any scheme, practice or device whereby the creamery or carrier for a differential in price paid or agreed to be paid to the farmer or dairyman or other producer is intended to or does, in fact, cover or absorb a transportation charge".

Plaintiff does not show that he is engaged in any competitive business with the creameries, and therefore does not show any injury resulting to him from this alleged discrimination. The fact that the creamery does not operate its conveyances for hire is sufficient reason for placing it in a different classification from that of plaintiff. The use made of these creamery trucks is necessarily limited and restricted, and the transportation done by them must be confined to operations between dairy ranches and creameries in transportation of dairy products.

It is suggested by plaintiff that some one must pay the cost of transportation by the creameries, that this can not be furnished gratuitously by them, and that necessarily it must be taken into consideration in the prices paid by them for dairy products. If creamery trucks can not be operated in accordance with the

provisions of the exemption, then, of course, they are not exempted and plaintiff has no complaint. If, instead of obliging each farmer as an exempt carrier to transport his dairy products to the creamery, the creameries gather up and convey the same to their plants, there will be a tendency to reduce traffic on the highways. There is sufficient authority in this state to justify this classification: *State v. Kozer*, 116 Or. 581 (242 P. 621); *Portland Van & Storage Co. v. Hoss*, 139 Or. 434 (9 P. (2d) 122, 81 A. L. R. 1136).

The opinion in *Continental Baking Co. v. Woodring*, supra, discusses and explains the decision in *Smith v. Cahoon*, supra, on which plaintiff here relies, as follows:

"The court was unable to find any justification for this distinction between carriers in the same business, that is, between those who carried for hire farm products, or milk or butter, or fish or oysters, and those who carried for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities.

"The distinction in the instant case is of a different sort. The statute does not attempt to impose an arbitrary discrimination between carriers who transport property for hire, or compensation, with respect to the class of products they carry. The exemption runs only to one who is carrying his own livestock and farm products to market or supplies for his own use in his own motor vehicle".

It is next asserted that the statute here in question makes unwarranted and unlawful discrimination in favor of the special carrier, in that logs, piling, poles and rough timber are exempted from the payment of the millage tax, and in lieu thereof a smaller payment is based upon the weight of the vehicle, and that the special carrier is also exempted from many of the oner-

ous regulatory provisions of the act, among which is mentioned the good faith bond required of contract and private carriers by section 22 of the act.

The special carrier is one limited to the transportation of logs, poles, piling or rough timber by motor vehicle from point of origin to mill, retail yard, point of consumption or railroad shipping point. He may or may not be a contract carrier. He may be both a contract carrier and a special carrier, inasmuch as a contract carrier is any one engaged in transporting property by motor vehicle for hire, other than a common carrier. If the special carrier is also a contract carrier, he is subject to all regulations of a contract carrier except as modified by the provisions of the law relating especially to motor carriers engaged in the transportation of certain timber and timber products, with the modification applying only while the special carrier is so engaged.

The common carrier is required to pay one mill per combined weight-ton-mile, while a special carrier is to pay a fee for each motor vehicle involved, "equal to an amount produced by multiplying the combined weight of the vehicle as defined herein by 45c per 100 pounds of such combined weight". Under section 9 of the act a contract carrier may haul and transfer logs, piling and poles. We may assume, without deciding, that while engaged in that business the tax or fee paid to the state by such contract carrier would be on the same basis as that of a special carrier as defined in the act. There is ample reason for applying to a special carrier different conditions from those applied to contract carriers. The special carrier is limited to the transportation of certain raw or unmanufactured products, whereas the contract carrier is not restricted as to class of commodities transported.

The operations of the special carrier are necessarily confined to certain parts of the state. The lumbering business is one of the principal industries of the state, on which a large part of the population is dependent, and the state is interested in encouraging and developing this industry. Moreover, the commodity which is carried by the special carrier might not, in the opinion of the legislature, be able to bear so large a tax as commodities ordinarily carried by the contract hauler.

In *Sproles v. Binford,* supra, in passing upon similar considerations, the court said:

"The average distance traveled by trucks carrying property from points of origin to common carrier receiving points, or from common carrier unloading points to destination, is from four to eight miles; these hauls are universally short. Such operations are confined to small areas and greatly reduce the danger of traffic congestion or highway injury incident to truck transportation. Those persons coming under the exception permitted by § 5 (b) of the act transport under distinctly different circumstances from complainant and interveners, who transport over fixed routes, and from other persons using the highways. This exception will have the effect of diverting from the highways generally a great deal of traffic and thus reduce congestion and danger."

The special carrier is subject to many of the regulations imposed upon a contract carrier. Before operating he must obtain a permit, which is only temporary and revocable and can not be granted by the commissioner without the recommendation and sanction of the state highway commission or county commissioners as to conditions which shall be imposed for the protection of the highways. These permits are to be revoked upon recommendation of the state highway commission or the county commissioners, as the case may be, when,

in the judgment of said highway commission or county commissioners, such revocation is necessary to preserve the highways.

By section 13 of the act, referring to permits to special carriers, the commissioner is authorized to issue a permit for temporary transportation service by contract carrier, which is limited to a reasonable time, and while the contract carrier is so operating he is not required to make the deposit directed by section 17. The special carrier is also required to maintain public liability insurance.

■ Subdivision 2 of section 22 provides that no permit shall be issued to any person to operate as a common carrier, private carrier or contract carrier until he has filed with the commissioner a bond satisfactory to that official in a sum not exceeding $1,000, conditioned that the applicant will pay any and all fees, taxes and penalties which may become due under the provisions of the act. Subdivision 4 of the section grants to the carrier the right to deposit in lieu of such bond, money or state highway bonds or obligations of the United States government equal in amount to the amount of the bond required. No such bond is required of special carriers, and the plaintiff claims that this is an unlawful discrimination against him. In this connection, however, it must be remembered that under section 20 of the act a special carrier pays a fixed amount for the privilege of operating, and that this amount is payable in advance. On the other hand, the contract carriers are required, under section 17, to deposit in advance the sum of $30, with an additional deposit of $6 for each additional ton in excess of five tons combined weight. The circuit court held that the giving of this bond by the contract carrier was an unnecessary burden and hardship upon him, and

consequently decided that subdivision 2 of section 22 was unconstitutional. It is apparent from reading the act that the legislature was of the opinion that the deposit required might not be sufficient to pay the fees, taxes and penalties for which the contract carrier might be liable. It was withhin the province of the legislature to provide this added protection for the state.

From the facts before us, there appears no undue or unlawful discrimination in favor of special carriers and against the plaintiff.

■ The motor transportation act requires a contract carrier to pay a tax of one mill per combined weight-ton-mile, and a private carrier to pay a tax of three-fourths mill. This is claimed by the plaintiff to be an unlawful discrimination in favor of the private carrier. This contention, however, is answered adversely by the decision of this court in *State v. Kozer,* supra, and *Portland Van & Storage Co. v. Hoss,* supra. In the latter case this court, in an opinion written by Mr. Justice ROSSMAN, said:

"The fundamental difference between a contract hauler and a commercial carrier is that the former is engaged in the contract transportation business, whereas the latter renders transportation facilities as an incident to the business in which he is engaged. Since the contract hauler receives compensation from the individual for whom he renders his service, while the commercial carrier does not, a substantial difference exists between the two individuals, as we shall later endeavor to point out. If our conclusion is warranted that the above constitute a substantial difference, then no judicial interference is justifiable with what the legislature has done, for legislative classification is never invalid when it is based upon something substantial and is not arbitrary and unreasonable": citing authorities.

618

■ The act here involved requires all motor carriers to file with the commissioner policies of public liability and property damage insurance issued by some insurance company. This is not demanded, however, of the motor vehicles exempted by section 3 of the act, and consequently plaintiff contends that the result is an unlawful discrimination against him. There appears no reason why the legislature should not have made this distinction. It is, however, not necessary here to point out all the grounds which could be assigned for such differentiation. On the principle announced in *Hodge Drive-It-Yourself Co. v. Cincinnati,* 284 U. S. 335, and other cases hereinbefore cited, the contention of plaintiff in this respect must be overruled.

■ In determining the validity of an act which has been attacked, the courts must and should resolve all doubt in favor of its constitutionality; and if the statute is reasonably susceptible of two constructions, one of which will render it constitutional and the other unconstitutional, the former will prevail. Unless the nullity and invalidity of the act are placed beyond reasonable doubt in the judgment of the courts, the act will not be declared void.

■ In passing upon the validity of the act in the case at bar, we have no right to consider the desirability, expediency, policy or wisdom of its enactment. That is the function of the legislative branch of our government.

"An otherwise valid statute or ordinance conferring a privilege is not rendered invalid merely because it chances that particular persons find it hard or even impossible to comply with precedent conditions upon which enjoyment of the privilege is made to depend". Gant v. Oklahoma City, 289 U. S. 98, 77 L..Ed. 738.

The act here in question involves many administrative features which can not be worked out and prescribed in detail by the legislature, and must necessarily be left to some one else to formulate and administer. This is not a delegation of legislative authority. In the event that the commissioner exceeds his authority, the plaintiff, if affected thereby, has his relief in the courts.

On the facts before us, we are constrained to hold that the motor transportation act is constitutional in all respects concerning plaintiff's rights here involved. The decree of the circuit court, in so far as it declares parts of the act unconstitutional, is reversed, and in all other respects is affirmed; and the suit is dismissed, neither party to recover costs in this court.

BEAN, J., took no part in the consideration of this opinion.