## PUBLIC SERVICE COMMISSION OF WYOMING v. GRIMSHAW

(No. 1941; December 17, 1935; 53 Pac. (2d) 1)

For the plaintiff there was a brief by *Ray E. Lee,* Attorney General; *Thos. F. Shea,* Deputy Attorney General; *Wm. C. Snow,* Assistant Attorney General,

of Cheyenne, and *W. W. Tipton*, Assistant Attorney General, of Laramie, and oral argument by *Mr. Shea*.

There was a brief *amicus curiae,* and oral argument by *Joseph Garst,* of Douglas.

164

For the defendant, there was a brief and oral argument by *H. Glenn Kinsley,* of Sheridan.

RINER, Justice.

This cause has been brought here and submitted for our consideration upon certain reserved constitutional questions, stated to be important and difficult, from the district court of Sheridan County. The procedure involved is that prescribed in Sections 89-5001 to 89-5003, inclusive, of the Wyoming Revised Statutes, 1931.

The record certified in the case discloses that the Public Service Commission of Wyoming, which for the sake of brevity may be referred to hereinafter as the "Commission," as plaintiff, filed in the court aforesaid its petition against W. C. Grimshaw, as defendant. This pleading sets forth two causes of action. Briefly stated, the first thereof alleges that the Commission, under the provisions of Chapter 65, Session Laws of Wyoming, 1935, is authorized to issue permits to private motor carriers and to initiate appropriate civil proceedings for the violation of any of those provisions; that the defendant is a private carrier, engaged in the transportation by motor vehicle over the highways of this State of property sold, or to be sold, by him, and also of supplies and property used by him in the furtherance of his private enterprise or industry; that the defendant as a private motor carrier, in order to lawfully operate a motor vehicle on the highways of this State, is required by the terms of Chapter 65, above mentioned, to apply to and secure from the Commission a permit so to do; and that defendant has been for some weeks, and is now, operating a motor vehicle, as a private carrier over the State highways, without applying for or securing such a permit, having both failed and refused to obtain one, despite the fact

that the Commission, its officers and agents have demanded that he do so.

The second alleged cause of action in the plaintiff's pleading is of similar character, the only substantial difference being that the defendant Grimshaw is averred to be a "contract motor carrier engaged in the transporting of persons and/or property of others by motor vehicle on and over the highways of the state for compensation under contract expressed or implied," and that as such contract motor carrier he persists in operating a motor vehicle over the state highways without a permit therefor, as required by Chapter 65, supra. The prayer of the petition is for a temporary injunction restraining the defendant from operating a motor vehicle over the highways of Wyoming, either as a private or as a contract motor carrier, and that upon trial of the action this injunction be made permanent.

To this petition defendant demurred on the ground that Chapter 65 aforesaid, upon which the alleged two causes of action embraced in plaintiff's petition are based, is void, because the Act transgresses certain paramount mandates found in our State and Federal Constitutions so as to nullify many of the sections of said chapter, which are enumerated in connection with the constitutional provisions they are asserted to infringe. This demurrer was argued, and upon the issues of law thus raised, some ten reserved questions have been certified here for us to answer concerning the validity under our State Constitution of twenty-three of the seventy sections embraced in Chapter 65 aforesaid.

One of the rules governing the disposition of cases submitted here on reserved constitutional questions has been stated by this Court in State v. Smart, 18 Wyo. 436, 110 Pac. 715, as follows:

"Under our statute the jurisdiction of the Supreme Court to decide questions thus reserved is confined to important and difficult constitutional questions arising in an action or proceeding, pending in the District Court. (Sec. 4276, R. S. 1899, as amended by Ch. 72, S. L. 1903.) And it has been uniformly held that this court will examine the original papers certified to it by the District Court in order to determine whether such questions arise in the action or proceeding, and whether their determination is necessary to a disposition of the case; it being the general rule that the constitutionality of a statute will not be determined unless necessarily involved in the case before the court. (State v. Kelley et al., 17 Wyo. 335.)"

Other rules are given in Salt Creek Transportation Company v. Public Service Commission, 37 Wyo. 488, 263 Pac. 621, thus:

"We must in any event limit our answers to the questions submitted to the points which have been specifically and fully argued. Constitutional questions are too important to be answered by this court at random, and they should not be answered unless fully presented.

\* \* \* \* \* \* \* \*

"The law is well settled that it is not sufficient for a party to say that a statute is unconstitutional as to other persons or classes of persons. It must appear that it is unconstitutional as to the person attacking it. 12 C. J. 762, 763; Zancanelli v. Coal & Coke Co., 25 Wyo. 511, 173 Pac. 981."

Applying these rules here, it is evident that the only questions which require attention on our part are those which deal with those sections of the Act under consideration which relate to the issuance of permits to the defendant as a private carrier and also as a contract carrier, the payment of fees required therefor, the exception of certain motor carriers from the operation of said sections, and the authority of the plaintiff to enforce these provisions in the method it has pursued. These questions are:

"1. Are Sections 9, 10, 11, 12, 13, 14 of Chapter 65, Session Laws of Wyoming, 1935, or any of them, violative of any of the following Sections of the Constitution of Wyoming, viz., Section 2, Section 6, Section 7, Section 33, Section 34, Article I?"

"2. Are Sections 15, 16, 17, 18 of Chapter 65 of Session Laws of Wyoming, 1935, or any of them, violative of any of the following Sections of the Constitution of Wyoming, viz., Section 2, Section 6, Section 7, Section 33, Section 34, Article I?"

"3. Are Sections 29, 31, 32, 33, 34 of Chapter 65 of Session Laws of Wyoming, 1935, or any of them, violative of any of the following Sections of the Constitution of Wyoming, viz., Section 2, Section 6, Section 7, Section 22, Section 33, Section 34, Article I?"

"4. Is Section 3 of Chapter 65 of Sessions Laws of Wyoming, 1935, violative of Section 34, Article I of the Constitution of Wyoming?"

"5. Is Section 66 of Chapter 65 of Session Laws of Wyoming, 1935, violative of Section 9, Article I of the Constitution of Wyoming?"

"6. Is Section 66 of Chapter 65 of the Session Laws of Wyoming, 1935, violative of Section 24, Article III of the Constitution of Wyoming, in that the provisions of said Section 66 are not clearly expressed in the title of the act appearing in said Chapter 65?"

"10. Is Section 56 of Chapter 65 of the Session Laws of Wyoming, 1935, violative of Section 6 or Section 7, Article I, or Section 1, Article III of the Constitution of Wyoming, or any of them?"

The 7th, 8th and 9th questions do not, we think, arise upon the record before us, and hence it will be unnecessary for us to examine them. As indicated, however, our discussion of the several interrogatories will properly be restricted to the points which have been "specifically and fully argued" concerning them.

In order to thoroughly understand the terminology employed by the several sections of Chapter 65 here

involved, certain definitions, with which we are now concerned and which are found in Section 2 of that Chapter, should be now given, viz.:

"Common Motor Carrier. Any person who undertakes for hire, or reward, to transport, by motor vehicle on and over the highways of the state, persons and/or property of those who choose to employ him and who holds himself out as being willing to undertake for hire such transportation from place to place, over regular routes with fixed termini."

"Contract Motor Carrier. Any motor carrier, other than a common motor carrier, who engages in the transporting of persons and/or property of others by motor vehicle on and over the highways of the state, for compensation, under contract, expressed or implied."

"Private Motor Carrier. A person engaged in the transportation, by motor vehicle or vehicles on and over the highways of the state, of property sold or to be sold by him, or purchased or otherwise acquired by him, in the furtherance of any private commercial enterprise, or property transported by the owner, lessee or bailee for the purpose of lease, rent or bailment, or in the transporting of supplies, equipment or any other property not herein enumerated, used in the furtherance of any private industry or enterprise."

The provisions of the Chapter aforesaid, relative to the issuance of permits to contract carriers, are found in its Sections 9 to 14 inclusive, which, other than where verbatim language is set out, summarized, declare: Section 9, that it shall be unlawful for a contract carrier to operate a motor vehicle on any highway without a permit and payment of all fees required by the Act; Section 10, that only the Commission can issue or refuse a permit which may be for a partial exercise of the privilege sought, "or it may attach to that privilege such terms and conditions as it may deem proper for the best interests of the public"; Section 11, that permits shall be issued to a contract

motor carrier applicant immediately upon his complying with the requirements of the Act concerning such a carrier, except that when it appears to the Commission that the purpose of the privilege thus sought is to compete unduly with a common carrier, serving the same territory, the application shall be granted only after a hearing held by the Commission, and if granted, the privilege shall be limited by conditions deemed necessary for the protection of such common carrier; but the operation of a contract carrier over irregular routes shall not be construed as undue competition; Section 12, that any contract carrier who on January 1, 1935, and continuously thereafter, or on the beginning of any calendar year thereafter, was legally operating upon any highway, shall be entitled to a permit upon application and payment of fees required by this Act; Section 13 prescribes what the application of a contract motor carrier for a permit shall contain and lists among the requirements an "agreement to charge a rate or fare not less than that as fixed and approved by the commission when the proposed operation conflicts with common motor carrier service over the same route"; Section 14 imposes a duty upon the Commission to regulate operations of all contract carriers " so that the safety of the highways will be preserved"; and "to that end, it shall require such contract motor carriers to provide safe and sanitary transportation facilities and deposit with it policies of insurance companies authorized to do business in Wyoming or other adequate security for adequate public liability and property damage insurance for the protection of the public generally and adequate security for the remittance to a shipper within ten days of all moneys collected on a collect-on-delivery shipment before a permit may be issued. The Commission shall require contract motor carriers to keep and retain such records for inspection by the Highway Department and make

such monthly reports as are deemed necessary truly to reflect the number of ton or passenger miles traveled by such carrier on the highways, and if its operations are in competition with the kind and class of service rendered by any common motor carrier, the commission shall require such contract motor carrier to charge a rate or fare not less than common motor carriers are required to charge for the same service on such route or in such territory." The remaining portion of this Section forbids a contract motor carrier to subject common carrier patrons to undue or unreasonable discrimination or to destroy or impair the service or business of any common carrier by unfair competition.

Upon the contentions advanced in behalf of the defendant, we are asked to view and determine the validity of certain portions of these Sections of the Act, in the light of the language of our State Constitution in Article I, Section 2 thereof, declaring that, "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal"; in Section 6 of the same Article, that "no person shall be deprived of life, liberty or property without due process of law"; in its Section 7, that "absolute arbitrary power over the lives, liberty and property of free men exists nowhere in a republic, not even in the largest majority"; in its Section 33, that "private property shall not be taken or damaged for public or private use without just compensation"; and in its Section 34, that "all laws of a general nature shall have a uniform operation." In order that each and all of the contentions of the defendant, as made herein, may be intelligently considered in connection with the provisions of Chapter 65 thereby attacked, there should be fixed in mind the declared purpose of the statute as set out in Section 1 thereof, as follows:

"The promotion of the safety of the highways, the collection of a fair and adequate compensatory fee for the commercial use of highways constructed with public money, and the maintenance of a sound, well-regulated transportation structure for the people of the state are declared to be the objectives of this law, and the provisions hereof the means to that end."

In Weaver v. Public Service Commission, 40 Wyo. 462, 278 Pac. 542, with the above stated constitutional declarations before it, this Court has said that "whatever rules and regulations are made in connection with the use of highways should be reasonable, operate with equality, and have some tendency to accomplish the end in view." Since the opinion in that case was rendered, it is common knowledge that hundreds of miles of arterial highways in this state have been regraded and hard-surfaced through the expenditure of funds in large measure supplied by the State through bond issues, license fees, its tax upon motor fuel and federal moneys granted to the State for that purpose. The result has been a very greatly increased use of these highways and their use also for commercial purposes to an extent hitherto unknown.

Discussing the altered conditions prevailing on the highways in Oregon and state authority to control them, in Anderson v. Thomas, 144 Ore. 572, 26 Pac. (2d) 60, the court used the following language:

"In recent years, with the advent of motor vehicles and the improvement of highways, there has arrived a new and rapidly growing form of commercial transportation—busses for passengers and trucks for freight. Oregon, one of the first states to appreciate the necessity of hard-surfaced highways, has spent many millions of dollars, raised by bond issues, license fees, and gasoline tax, in the construction and maintenance of highways and bridges. With the increase of traffic it has been necessary to widen and straighten the roadways, and in many instances to rebuild them

entirely, in order to care for present and future needs. Either alone or in co-operation with the state the cities and counties have contributed many more millions of dollars in establishing rights of way and in the construction and maintenance of highways.

" 'The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual, and extraordinary. As to the former, the extent of legislative power is that of regulation; but, as to the latter, its power is broader. The right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all the authorities.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

" ' "The rule must be considered settled that no person can acquire the right to make a special or exceptional use of a public highway, not common to all citizens of the state, except by grant from the sovereign power." Jersey City Gas Co. v. Dwight, 29 N. J. Eq. 242; McQuillen, Municipal Corporations, 1620.' Ex parte Dickey, 76 W. Va. 576, 85 S. E. 781, 782, L. R. A. 1915F, 840."

Early this year, in Kelly v. Finney, (Ind.) 194 N. E. 157, concerning the same subject matter, the Supreme Court of Indiana said this:

"It is common knowledge that contract hauling over the highways of this state and elsewhere has had a very rapid growth in the last few years, and that the highways are being taken and badly used by motor vehicles engaged in the transportation of freight for hire. The use of the highways of the state by a vast and constantly growing number of contract carriers has developed a very difficult and perplexing public problem. Sound public policy justifies action on the

part of the Legislature to conserve the public highways for their primary use, and also to prevent the destruction of our railroad system in which the people of our state have a very vital interest. The vast amount of contract hauling over the highways of our state has not only subjected the highways to an additional burden, but has had the effect of greatly reducing the amount of freight which would be carried by the railroads within the state. Certainly the removal or amelioration of that burden, with its resulting improvement of the highways, less interference with their primary use and the benefit to the railroads, in whose welfare the public has an interest, creates a legitimate subject for the exercise of the legislative power of the state. That this was one of the chief ends of the act in question is clear, and the act in question was but a means adopted to accomplish the legitimate end of both conserving the state highways and the protection of other common carriers. The extent to which this act, as a means, conduces to that end, the degree of its efficiency, the closeness of its relationship to the ends sought to be attained, all are matters addressed to the sound judgment of the Legislature, and not a question for the courts to decide. It is sufficient if it can be seen that in any degree, or under any reasonably conceived circumstances, there is an actual relation between the means employed and the end to be accomplished."

Discussing the situation prevailing in the State of Kansas, in Continental Baking Company v. Woodring, 286 U. S. 352, 52 S. Ct. 595, 76 L. Ed. 1155, Mr. Chief Justice Hughes, quoting language employed by the lower court, said:

" 'The state of Kansas has constructed at great expense a system of improved highways. These have been built in part by special benefit districts and in part by a tax on gasoline sold in the state and by license fees exacted of all resident owners of automobiles. These public highways have become the roadbeds of great transportation companies, which are actively and seriously competing with railroads which provide their own roadbeds; they are being used by

concerns such as the plaintiffs for the daily delivery of their products to every hamlet and village in the state. . The highways are being pounded to pieces by these great trucks, which, combining weight with speed, are making the problem of maintenance well-nigh insoluble. The Legislature but voiced the sentiment of the entire state in deciding that those who daily use the highways for commercial purposes should pay an additional tax. Moreover, these powerful and speedy trucks are the menace of the highways.' "

That was a case where plaintiffs as private motor carriers, under a motor vehicle act quite closely resembling in many respects Chapter 65, supra, operated bakeries in Kansas and other states and made deliveries to their customers by their own trucks. Their contentions that this law, by reason of the obligations it imposed and through its classifications, violated the due process and equal protection clauses of the Fourteenth Amendment, as well as other provisions of the Federal Constitution, were disallowed, both by the U. S. District Court, composed of three judges, and by the National court of last resort.

While the increase in the number of private and contract carriers, and growth in the use of the main highways in this State for commercial purposes, has not been as great in Wyoming as in the states referred to above, yet it cannot be denied that the increase here has been steady and constant as time passed and the highways became more and more improved, as above described. This leads us to say that, in our judgment, the State may establish proper statutory control to preserve and maintain the investment it has thus made for the benefit of all its citizens, and that the sections of Chapter 65, supra, above reviewed, embody requirements which "have some tendency to accomplish the end in view,"—with some exceptions to be presently mentioned.

Section 14 of the Chapter is severely criticised by the defendant because it compels a contract carrier to furnish adequate security for "public liability and property damage insurance for the protection of the public generally." It is pointed out in this connection that the six sections of the Act listed above, vest power in the Commission to control rates charged by contract carriers when their operation comes into competition with common carriers, and that Section 18 of the chapter aforesaid, which deals with private carriers, contains the same requirement as to liability insurance. The defendant then insists, in effect, that these regulations would transform the contract and private carriers into common carriers, in violation of the rule announced in the Weaver case already cited. We cannot accept this view, and the present trend of authority indicates that defendant is mistaken.

In Continental Baking Company v. Woodring, supra, the court said, relative to the Kansas statute:

" 'Private motor carriers of property' must obtain a license, pay a tax, and file a liability insurance policy. The public service commission has no authority to refuse a license if the described information is given with the application, the liability insurance policy is filed, and there is compliance with the regulations and payment of the license fee. Section 8.14. It is not shown that either regulations or license fees are unreasonable. The tax and the license fees, over the expenses of administration, go to the highway fund of the state for the maintenance and reconstruction of the highways the carrier is licensed to use. The insurance policy is to protect the interests of the public by securing compensation for injuries to persons and property from negligent operations of the carriers. Section 21.15. The District Court approved an earlier decision, also by a District Court of three judges, that this provision was not intended to require 'security for passengers or cargoes carried, but only to protect third persons from injuries to their persons or prop-

erty.' 55 F. (2d) at page 357; Louis v. Boynton (D. C.) 53 F. (2d) 471, 473. This is an admissible construction, and no different application of the provision appears to have been made by either the state court or the commission.

"Requirements of this sort are clearly within the authority of the state which may demand compensation for the special facilities it has provided and regulate the use of its highways to promote the public safety."

We so construe the language of Chapter 65 contained in said Sections 14 and 18, which direct the giving of security by private and contract motor carriers for public liability and property damage. It is not difficult to perceive that such regulations definitely make for safety in the operation of all motor vehicles on the highways. See Sprout v. City of South Bend, Indiana, 277 U. S. 163, 48 S. Ct. 502, 72 L. Ed. 833; Deppman v. Murray, 5 Fed. Supp. 661.

However, that provision in Section 14 which forbids the issuance of a permit to a contract carrier until adequate security has been deposited with the Commission "for the remittance to a shipper within ten days of all moneys collected on a collect-on-delivery shipment," is, as we view it, in the teeth of what was held in the Weaver case, supra. There it was said:

"Highways exist for the benefit of the members of the public at large, and the only right which the state has to regulate or prohibit their use must be sought in the police power of the state to promote the safety, peace and general welfare of the people. Unless the liberty to contract to act as private carrier and to seek happiness in that calling interferes with that safety, peace and general welfare, the legislature has no right to forbid or control it. The right to make contracts is both a liberty and a property right, and is within the protection of the guaranty against taking of liberty or property without due process of law, and while that right is subject to reasonable restraint in the interest

of the public welfare, arbitrary and unreasonable restrictions or regulations are void. 12 C. J. 1200."

And in Michigan Public Utilities Commission v. Duke, 266 U. S. 570, 45 S. Ct. 191, 69 L. Ed. 445, referring to a clause in a state statute, which imposed upon a private contract carrier the duty of furnishing an indemnity bond "conditioned upon the payment of all just claims and liabilities resulting from injury to * * * property carried by such carrier," the court remarked: "Clearly, these requirements have no relation to public safety or order in the use of motor vehicles upon the highways, or to the collection of compensation for the use of the highways." We regard this portion of the section, therefore, as unconstitutional, as being no exercise of the police power and an unreasonable interference with the right to make contracts on the part of contract carriers.

In passing, we may refer to that portion of Section 10, supra, which assumes to vest power in the Commission to attach to the permit to be issued to a contract carrier, "such terms and conditions as it (the Commission) may deem proper for the best interests of the public." Taking this language at its broad face value, it would appear to have no relation to the end sought by the statute, as well as to be an unconstitutional delegation of power within the meaning of Section 1 of Article II of the Wyoming Constitution, which declares:

"The powers of the government of this state are divided into three distinct departments: the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

However, if the language of said Section 10 is construed by the Commission so as to permit the insertion of conditions entirely within the purview of the explicit provisions of Chapter 65 itself, then, of course, the above indicated consequence would. not ensue. Whatever uncertainty may exist with respect to unwarranted terms inserted in such a permit can be resolved when the Commission acts concerning the matter. If any of these terms or conditions transcend statutory or unconstitutional limits, the defendant will, of course, have his appropriate remedy.

Complaint is made that the Act in question, by its Sections 11 and 14 aforesaid, attempts to prevent competition between contract carriers and common carriers, and fixes and limits the rates of the former as they may affect the latter, this being merely, it is said, a regulation of the business of the former and possessing no connection with the use of the highways. The case of Stephenson v. Binford, 287 U. S. 251, 53 S. Ct. 181, 77 L. Ed. 288, was an appeal from the United States District Court for the Southern District of Texas, wherein, before the statutory court of three judges, an injunction was sought by appellants, to restrain certain state officials, members of the Texas Highway Commission and State Railroad Commission, with others, from enforcing certain provisions of a statute of that State, which purported to regulate the use of its highways by motor trucks. One of these provisions, after requiring contract carriers, before they commenced operations, to obtain permits from the Railroad Commission, directed that such permits should be granted only after a hearing and not if the Commission should be of the opinion "that the proposed operation of any such contract carrier will impair the efficient public service of any authorized common carrier or common carriers adequately serving the same territory." Another provision gave the

Commission authority to prescribe minimum rates to be collected by contract carriers, "which shall not be less than the rates prescribed for common carriers for substantially the same service." The similarity of these requirements of the Texas law with those in said Sections 11 and 14 may well be noted. It was contended on behalf of appellants, as here, that the effect of the statute was to convert private carriers into common carriers by legislative fiat, thus taking their property for public use without adequate compensation and depriving them of their property without due process of law. Affirming a decree denying an injunction, the National Supreme Court said concerning these provisions of the law:

"Turning our attention then to the provision for permits, it is to be observed that the requirement is not that the private contract carrier shall obtain a certificate of public convenience and necessity, but that he shall obtain a permit, the issue of which is made dependent upon the condition that the efficiency of common carrier service then adequately serving the same territory shall not be impaired. Does the required relation here exist between the condition imposed and the end sought? We think it does. But, in any event, if the Legislature so concluded, as it evidently did, that conclusion must stand, since we are not able to say that in reaching it that body was manifestly wrong. Jacobson v. Massachusetts, 197 U. S. 11, 30, 31, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765. Compare Euclid v. Ambler Realty Co., 272 U. S. 365, 395, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Zahn v. Board of Public Works, 274 U. S. 325, 328, 47 S. Ct. 594, 71 L. Ed. 1074. Debatable questions of this character are not for the courts, but for the Legislature, which is entitled to form its own judgment. Sproles v. Binford, 286 U. S. 374, 388, 389, 52 S. Ct. 581, 76 L. Ed. 1167. Leaving out of consideration common carriers by trucks, impairment of the railway freight service, in the very nature of things, must result, to some degree, in adding to the burden imposed upon the highways. Or, stated conversely,

any diversion of traffic from the highways to the railroads must correspondingly relieve the former and therefore contribute directly to their conservation. There is thus a substantial relation between the means here adopted and the end sought.

\* \* \* \* \* \* \* \*

"What has just been said applies in the main to the other challenged provision authorizing the commission to prescribe minimum rates not less than those prescribed for common carriers for substantially the same service. This provision, by precluding the contract carriers from rendering service at rates under those charged by the railroad carriers, has a definite tendency to relieve the highways by diverting traffic from them to the railroads. The authority is limited to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly, this interferes with the freedom of the parties to contract, but it is not such an interference as the Fourteenth Amendment forbids. While freedom of contract is the general rule, it is nevertheless not absolute but subject to a great variety of legitimate restraints, among which are such as are required for the safety and welfare of the state and its inhabitants."

See also Kelly v. Finney, supra. It is apparent, under this cogent line of reasoning, that these particular requirements of Sections 11 and 14, which have been thus assailed, have a definite reference to the end sought by Chapter 65 aforesaid, viz., the safety of the public in the use of and the preservation of the highways of this State.

The provisions of Section 14 and 18 aforesaid are also questioned because they require both contract and private carriers to keep such records for inspection by the Highway Department, and make such monthly reports, as are necessary "to reflect the number of ton or passenger miles traveled by such carrier on the highways," and it is said that these requirements have nothing whatever to do with the highways,

except as they may be incident to the collection of the compensatory fees prescribed in Section 29 of said Chapter, for the "maintenance, repair and reconstruction of the highways."

But the Kansas statute (Chapter 236 of the Laws of 1931), hereinbefore referred to, also laid a special tax or compensatory fee, based upon mileage, upon carriers who carried for hire (public and contract carriers), and upon those who were engaged in the transportation by motor vehicle of property sold in furtherance of any commercial enterprise (private carriers). The moneys arising from these taxes, as in the Wyoming law, were required to be used for the maintenance, repair and reconstruction of the public highways. The Public Service Commission of that state was given power "to regulate and supervise the accounts, schedules, service and method of operation of same; to prescribe a uniform system and classification of accounts to be used; to require the filing of annual and other reports and any other data." Concerning the power of the state to impose those fees and the propriety of the law's requirements as to records to be kept and reports to be made by such carriers, the United States District Court for the Second Division of Kansas, composed of three judges, in Louis v. Boynton, 53 Fed. (2d) 471, said:

"And it may impose fees with a view both to raising funds to defray the cost of supervision and maintenance, and to obtaining compensation for the use of the road facilities provided. Buck v. Kuykendall, 267 U. S. 307, 314, 315, 45 S. Ct. 324, 65 L. Ed. 623, 38 A. L. R. 286; Kendrick v. Maryland, 235 U. S. 610, 35 S. Ct. 140, 59 L. Ed. 385; Clark v. Poor, 274 U. S. 554, 47 S. Ct. 702, 71 L. Ed. 1199. The act here was passed to provide revenue for the supervision and upkeep of the highways of the state.

\* \* \* \* \* \* \* \*

"Attack is also leveled at certain provisions of Chap-

ter 236, supra, which require the furnishing of certain reports, data, and information to the commission. This information is essential to the enforcement of the tax provisions of section 13 and in our judgment may be required of all carriers subject to such tax."

The same court in the later case of Continental Baking Company v. Woodring, 55 Fed. (2d) 347, affirmed on appeal, as stated above, the personnel of the court being changed, remarked: "If this tax is to be collected, some books of account must be kept by the carriers that will reflect the mileage of their trucks. The Legislature has power to authorize the commission to require such bookkeeping and such reports as will accurately reflect the mileage of the trucks." It is evident that these provisions are a legitimate means to accomplish the objectives of the law in question, objectives which we have seen are essentially proper ones.

The provisions of Chapter 65, supra, governing the issuance of permits for private motor carriers, are contained in Sections 15, 16, 17 and 18 thereof. These portions of the law are attacked as in violation of the same sections of our State Constitution as were invoked as being applicable to its contract carrier permit provisions, because they require such carriers to deposit with the Commission adequate security for public liability and property damage and the keeping of records and making reports for the information of the Commission. We have already discussed these matters in connection with contract carriers, and deeming what was there said as applicable to the sections last above enumerated in the particulars specified, we need not retrace the ground. The contentions thus made cannot be upheld.

Sections 29, 31, 32, 33 and 34 of said Chapter, generally speaking, fix the amount of the compensatory fees to be charged by the Commission, invest the Highway Department with authority to collect these

fees, authorize that Department to examine and audit the mileage records required to be kept and certified to said Department by motor carriers, determine the date for payment of such fees each month and impose a lien upon all the carrier's property to secure them in case they are not paid. These provisions are also contended to be in conflict with the several sections of the State Constitution already mentioned, but under the authorities above cited and in view of what has hereinbefore been said, we are constrained to reach the conclusion that they may not be thus attacked successfully.

It is declared by Section 3 of the Act that it shall not apply to motor carriers operating "wholly within the confines of any Wyoming municipality or motor carriers transporting persons and/or property to and from such municipality to airports considered adjacent thereto, nor to transportation in his own motor vehicle by any farmer or rancher, or the employee of said farmer or rancher exclusively in his service, transporting produce or commodities for his own use to or from his own farm or ranch, nor to the exchange of transportation by farmers, or the employee of said farmers exclusively in their service, transporting seasonable crops being harvested and transported to regular markets or shipping points, nor to the exclusive transportation of children to and from school, nor to transportation by motor vehicle when such motor vehicle is owned and operated by the United States, the State of Wyoming, or any subdivision thereof, nor to the gross weight of United States mail transported in any motor vehicle." Section 34 of Article I of the Wyoming Constitution, quoted above, is said to be inimical to these exemptions. But the late pronouncements of the National Supreme Court, in Continental Baking Company v. Woodring, supra; Stephenson v. Binford, supra; Hicklin v. Coney, 290 U. S. 169, 54

S. Ct. 142, 78 L. Ed. 247; Aero Mayflower Transit Company v. Georgia Public Service Commission, 295 U. S. 285, 55 S. Ct. 709, 79 L. Ed. 1439, would indicate otherwise. So do the following recent cases from courts of final authority in the States of the Union: State v. Hicklin, 168 S. C. 440, 167 S. E. 674; Anderson v. Thomas, supra; Kelly v. Finney, supra; State v. Public Service Commission of Wisconsin, 207 Wis. 664 242 N. W. 668. In some of these cases the classified statutory exemptions were much more inclusive in their terms than Section 3 supra. This court has pointed out in State v. A. H. Read Co., 33 Wyo. 387, 240 Pac. 208, relative to the constitutional provision last above mentioned, that it "is held to be satisfied by a statute 'applying uniformly within a class of persons based on a reasonable distinction, or objects of a reasonable class, and operating the same on all parts of the state under the same circumstances.' 36 Cyc. 992." This test under the Federal and state cases cited supra, the section of the law now under consideration appears to meet. It is unnecessary to outline their reasoning here. It will suffice to say that we think they have covered the point thoroughly.

The decision in Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264, relied upon by the defendant, has had its legal effect repeatedly reviewed by the above cited later cases from the court from which it emanated. See especially Aero Mayflower Transit Company v. Georgia Public Service Commission, supra. In view of its subsequent interpretation by the National Supreme Court, we are obliged to conclude that it cannot be regarded as applicable here.

Section 66 of the Act provides:

"The district courts of the State of Wyoming are hereby invested with jurisdiction to prevent and restrain violations of this Act, or of any provisions

hereof, or of any rule, regulation or order of the commission or Highway Department passed or promulgated pursuant hereto."

This section is challenged as contrary to that part of Section 9 of Article I of the Wyoming Constitution which declares that "the right of trial by jury shall remain inviolate in criminal cases," and, also, as in disregard of that portion of Section 24 of Article III of the same instrument which commands, with certain exceptions, that "no bill * * * shall be passed containing more than one subject, which shall be clearly expressed in its title." The point first suggested does not arise on the record before us, and the second one, it seems to us, has been fully disposed of by the decision of this Court in Tucker v. State, 35 Wyo. 430, 251 Pac. 460, where, referring to the former decision in State ex rel. Wycoff v. Ross, 31 Wyo. 500, 228 Pac. 636, it was said that:

"A title may be sufficiently general and comprehensive to embrace every means and end necessary or convenient for the accomplishment of the general purpose expressed therein. The title to the chapter in question is in regard 'to intoxicating liquor, prohibiting the unlawful possession, manufacture and sale thereof * * * and carrying into effect so far as the State of Wyoming is concerned, the eighteenth amendment to the Constitution of the United States.' We think that proceedings for the abatement of a liquor nuisance and proceedings incident thereto are proper and convenient means to carry into effect the general purpose of the act as expressed in this title."

In the case at bar the title of the Act reads in part: "Providing procedure for the administration and enforcement of this Act and incidents thereto, for appellate and other related jurisdiction of, for collection and distribution of filing and compensatory fees and penalties." This title is certainly broad enough to include the grant of jurisdiction to the district court to

prevent and restrain violations of the Act in question within the rule announced by the cases just cited.

The only part of Section 56 of Chapter 65 aforesaid, which we deem necessary to be considered in connection with questions arising upon the record before us, is the opening clause, reading: "The commission or Highway Department may initiate any appropriate civil proceedings in the courts of this state to enforce obedience to, or for the violation of any provisions hereof." That portion of the section dealing with the enforcement of "orders, rules or regulations," does not seem to be at present involved. The section in its entirety is questioned as inimical to Sections 6 and 7 of Article I of the Wyoming Constitution, already mentioned, and to Section 1 of Article II of that instrument, which vests the legislative power of this commonwealth in a senate and house of representatives. The contentions and arguments of the defendant would appear to be in a large measure directed against that portion of the section with which the present litigation is not concerned.

However, it is argued that the Legislature may not authorize the Commission or the Highway Department to institute, or the district courts of this State to entertain, suits to restrain the performance of acts in violation of the provisions of the law itself which are made misdemeanors. It is intimated that a defendant would thereby be deprived of a jury trial and that no property rights are affected, no nuisance exists and the health or safety of the public is not concerned. We think it apparent nevertheless, from the scope of Chapter 65 aforesaid and from the trend of authority in the construction of laws of this character, as we have endeavored to show, that the property rights of the state and the public generally are definitely involved in the maintenance and ordinary use of the

improved highways in Wyoming; and that the safety of the public upon the highways, a most important right, is also measurably affected. While it is true, as is stated by 14 R. C. L. 370, Section 78, that, "it is now the rule that where acts complained of are violations of the criminal law, courts of equity will not on that ground alone interfere by injunction to prevent their commission, as they will not exercise their powers for the purpose of enforcing the criminal laws by restraining criminal acts," the same text says:

"On the theory that equity will afford protection by enjoining crime when rights and interests are injuriously affected thereby, there is support for the rule that the state may restrain a criminal act when its interests or the interests of those entitled to its protection are thus affected. Therefore the state, through its attorney-general, may apply for an injunction to restrain the consummation of a conspiracy to violate the election laws by padding registration lists, permitting repeating and falsifying returns, and the court in granting such relief, under these circumstances is not exercising a political rather than a judicial function."

See also 32 C. J. 279, Section 442.

The case of Board of Medical Examiners of Utah v. Blair, 57 Utah 516, 196 Pac. 221, was one where that Board was by statute authorized to institute civil actions to enjoin any one from practicing medicine within the State of Utah who had not procured from said Board a license so to do. The statute also made the practice of medicine without a license a misdemeanor. It was there urged, as here, that courts will not enjoin the threatened commission of a crime, that such proceedings were unknown to the common law and further that the defendant was entitled to a jury trial by constitutional right, which would be destroyed by this indirect way of enforcing a penal statute. Rejecting these contentions the court said:

"It may be conceded that the power to enjoin the threatened commission of ordinary crimes has never been recognized by the courts. But we are here dealing with the right or power of the Legislature to enact and to provide means for the enforcement of regulations looking to the health of the community. If no other or worse results would or could follow the violation of the penal provisions of a statute than the arrest and punishment of any one violating such provisions, it might well be that the Legislature would not have the authority to provide a remedy by injunction. As indicated, the statute was enacted, not to provide a means of punishing those violating its provisions, but to protect the community from what, in the judgment of the Legislature, was or might be detrimental to the public health. The power of the court, while not often called into force, to prevent such an injury, has been repeatedly recognized in the decisions of the courts of this country." (Citing many authorities.)

In the foregoing quotation, by merely substituting the word "safety" in lieu of the word "health" the language becomes directly pertinent to the case at bar. In the application of the police power of the state, the matters of health and safety stand on the same plane, as is well known. The court, additionally, very well pointed out:

"If it be insisted, as it is, that the violation of the injunction may result in the imprisonment of the defendant, the punishment would not be for the violation of a statute, but for violating an order of the court. As concisely stated by the Supreme Court of Indiana in State v. Roby, supra, at page 189 of 142 Ind., at page 152 of 41 N. E. (33 L. R. A. 213, 51 Am. St. Rep. 174):

" 'It is further contended that, in case of the violation of an injunction under the civil remedy part of the act, the court might fine the defendant for contempt, for disobeying the order of injunction, and that would make him liable to double punishment. The statement of the proposition furnishes a sufficient an-

swer thereto. In that case he would not be punished for crime, but for contempt of court.'

"Courts will of necessity be controlled, in issuing injunctions, by the usual rules that influence or control courts of equity in the exercise of that remedy. If there be a doubt or uncertainty as to the violation of the statute or that there will be a continued violation of it if the injunction is not issued, the writ should not issue. In this case the defendant made no attempt to deny or contradict the fact that he had been engaged, and intended to continue, in diagnosing and treating physical and mental ailments without procuring a license so to do as required by statute."

Of similar import are the cases of State v. Fray, 214 Iowa 53, 241 N. W. 663, 81 A. L. R. 286 and cases cited therein; New Orleans v. Liberty Shop, 157 La. 26, 101 So. 798, 40 A. L. R. 1149; Kentucky State Board of Education Examiners v. Payne, 213 Ky. 382, 281 S. W. 188.

In Farrell v. City of Mobile, 229 Ala. 294, 156 So. 635, it was held that injunction was an appropriate remedy to compel taxicab drivers to obey a city ordinance, which imposed punishment through fine or imprisonment, as in a criminal case, by preventing them from using the streets of the city for transporting passengers unless they deposited with the city a bond to indemnify for public liability and property damage.

We think it very clear from the record submitted, that in the case at bar the defendant is persisting in his violation of the provisions of the Act requiring him to procure a permit. Where a motor carrier is pursuing a continued course of conduct, in direct disregard of constitutional statutory commands contained in the motor vehicle act under consideration, we see no sufficient legal reason why the Legislature may not add to the liability of punishment, as for a misdemeanor, in the event of violation of its terms, the further and

cumulative preventive remedy by injunction. Under such circumstances, in addition to protecting rights and property of the state, the civil remedy might very well be regarded as the more effective to accomplish the end sought by the Legislature and the penal provision inadequate, as leading to ever recurring litigation.

With the exceptions indicated above, we answer each of the listed questions, "No."

KIMBALL, Ch. J., and BLUME, J., concur.